PAPER MAKERS IMPORTING CO.,
Inc., and Hammill & Gillespie, Inc.

v.

CITY OF MILWAUKEE.

No. 56–C–52.

United States District Court
E. D. Wisconsin.

Sept. 19, 1958.

O. S. Hoebreckx and John Vergeront, Milwaukee, Wis., for plaintiffs.

Harvey G. Odenbrett, Robert Sullivan and Peter Stupar, Asst. City Attys., Milwaukee, Wis., for defendant.

SWYGERT, District Judge.

The above entitled cause came on regularly for trial, and the Court having duly considered the evidence and being fully advised in the premises, now finds the following:

### Findings of Fact.

1. Paper Makers Importing Co., Inc., one of the plaintiffs, is a corporation incorporated under the laws of the State of New Jersey, with its office and principal place of business in Easton, Pennsylvania. Hammill & Gillespie, Inc., the other plaintiff, is a corporation chartered under the laws of the State of Delaware, with its office and principal place of business in New York City. Defendant is a municipal corporation and body politic organized under the laws of the State of Wisconsin. The matter in controversy, exclusive of interest and costs, exceeds $3,000.

2. Plaintiffs are importers of clay from England. In 1955 plaintiffs contracted with Kohler Co. (a Wisconsin corporation with its office and principal place of business in Kohler, Sheboygan County, Wisconsin) to sell and deliver to Kohler at Sheboygan, Wisconsin, six cargoes of ball and china clay to be delivered during the 1955 shipping season.

3. Plaintiffs chartered the M. V. Fossum and the M. V. Divina to transport such clay from Fowey, England to Sheboygan, Wisconsin. The Fossum was a vessel registered out of Skien, Norway and owned by several Norwegian citizens. The Divina was a vessel registered out of Porsgrunn, Norway and owned by A. S. Frisco, a limited corporation organized under Norwegian laws.

4. The order form used by the Kohler Co. to order the clay from plaintiffs contained the term "F.O.B. Boat at Sheboygan, Wis." The manifest of the Fossum listed the plaintiffs as consignees of the cargo. However, the intention of the Kohler Co. and of the plaintiffs, as is evidenced by correspondence carried on in 1952 between Kohler Co. and the plaintiffs, was that the title to the clay passed at the time the clay was loaded into the stevedores' clamshell buckets and was lifted free from the hold of the ship.

5. The Fossum left Fowey, England on Sunday, June 12, 1955, carrying 1693.6 gross tons of clay and arrived at Sheboygan, Wisconsin on July 2, 1955 at 10:50 a.m., docking at Hildebrand's Wharf. The ship was not unloaded immediately due to its late arrival, and, inasmuch as ships are not customarily unloaded on Sundays or holidays, preparations were not commenced until Tuesday, July 5, 1955.

6. On or about July 5, 1955, a second cargo of 1542 gross tons of clay consigned to plaintiff Paper Makers Importing Co., Inc. was enroute to Sheboygan on the Great Lakes in the hold of the Divina.

7. Under the contract of sale, Kohler Co. undertook to arrange and pay for the discharge of the cargoes from the vessels at dockside, Sheboygan, Wisconsin. Kohler Co. contracted with Buteyn Bros., a co-partnership, of Sheboygan, Wisconsin to discharge the clay cargoes into hoppers at dockside, Sheboygan, Wisconsin.

8. On July 5, 1955, Buteyn Bros. attempted to discharge the cargo of the Fossum. At this time the Kohler Co. was strike bound due to a labor dispute between it and its union employees. Kohler employees appeared on the dock at Sheboygan for the ostensible purpose of picketing the vessel and its cargo. As a result of disturbances on the dock, Buteyn Bros. was unable to unload the Fossum.

9. S. Douglas Brian was the duly elected president of Paper Makers Importing Co., Inc. and was authorized to act for and bind said plaintiff. The same Brian was the duly authorized agent of Hammill & Gillespie, Inc. and acted on its behalf in connection with all matters referred to in this action and other matters involved in these proceedings in which the said Hammill & Gillespie, Inc. had an interest.

10. Defendant, at all times herein, through its Harbor Commission, was engaged in the business of a public wharfinger and held itself out to the public as ready, willing, and able to furnish facilities for the docking, loading, and unloading of cargoes and vessels for hire, and for the transshipping of goods in interstate and foreign commerce between water and land facilities. At all times material herein, defendant had at its disposal docks, cranes, and other facilities capable of handling the cargoes of the Fossum and the Divina.

11. The Harbor Commission is an agency of defendant in connection with the harbor facilities. Such facilities were under the direct supervision and control of one Harry C. Brockel, duly authorized to act as Municipal Port Director. The said Municipal Port Director has at all times material hereto supervised and managed the Milwaukee Municipal Harbor Terminal for defendant and the Board of Harbor Commissioners, subject to and pursuant to the charter of the

City of Milwaukee and the statutes of the State of Wisconsin. Brockel was further authorized to promote business for the Terminal, to set rates for cargoes not covered by the tariff, to make arrangements personally and through subordinates for the handling of cargo at the Terminal, and do all other things reasonable and necessary in connection with the operation of the Terminal consistent with the general or special directions of the Harbor Commission.

12. Following the disturbances on the dock at Sheboygan, it was decided by Kohler Co. and Brian to make an effort to unload the vessels at a port having adequate facilities. Brian called Brockel for information relative to harbor facilities at the Milwaukee port. On the afternoon of July 5, 1955, Brian and Lucius P. Chase, General Counsel for the Kohler Co., conferred with Brockel at his office in Milwaukee. Brian informed Brockel that he and Hammill & Gillespie, Inc. were the owners of the cargoes and requested Brockel to provide the facilities of the port for docking and unloading the Fossum and the Divina. Brockel stated to Brian that a strike among the employees of Kohler Co. was an inland strike not recognized under the policy of the Harbor Commission and agreed that the Milwaukee Municipal Harbor Terminal would accept and unload the Fossum and the Divina, quoting a tentative or experimental rate schedule of $2 per ton of cargo plus additional charges for incidentals. Brockel further stated that it would be necessary for plaintiffs to furnish written authorization containing handling instructions, pursuant to the requirements of the port tariff, before unloading could be attempted.

13. On the evening of July 5, 1955, Brockel was informed of the occurrences in Sheboygan on that day which had prevented the Fossum from unloading at that port and that said occurrences were a direct result of a strike then in progress among certain employees of Kohler, said information being derived from press and radio accounts.

14. On the evening of July 5, 1955, Brian telephoned the American agents for the Fossum in New York informing them of the conference with Brockel and of Brockel's request for written unloading authorization and handling instructions.

15. On the morning of July 6, 1955, Brockel received a telephone call from Simpson, Spence & Young of New York, American agents for the said Fossum requesting to be advised of the procedure required to secure a berth at defendant's port facilities for the Fossum; the said Brockel informed Simpson, Spence & Young that he had as yet received no written authorization or instruction for the handling of the cargo, and that he would require such an authorization. Brockel was advised in return that such written authorization would be forthcoming from the cargo owners, Paper Makers and Hammill & Gillespie. Brockel then called certain subordinates, namely, the dock superintendent and the assistant dock superintendent, to his office and instructed them to receive and discharge the Fossum and to immediately arrange for and have spotted the gondola railroad cars required to receive the clay from the Fossum. During the afternoon of July 6, 1956, Brockel called the Milwaukee Police Department and asked it to be on the alert to provide protection in the event of any unusual disturbance or interference with the unloading of the Fossum after her arrival.

16. The Fossum departed from Sheboygan at 11:20 p. m. C.S.T., on July 6, 1955, bound for Milwaukee. During the evening of July 6, a labor union representative telephoned Frank C. Zeidler, Mayor of Milwaukee, and informed him that the Fossum was enroute to defendant's dock. Brockel and Dock Superintendent Wagner, early on the morning of July 7, left Milwaukee aboard ship for Muskegon, Michigan, leaving Assistant Dock Superintendent Seefeldt in charge of the dock.

17. The Fossum arrived at Milwaukee at 6:45 a. m. C.S.T., on July 7, 1955 and

was docked at Municipal South Pier No. 1. At this time, gondola railroad cars were spotted alongside the dock at the instance of employees of defendant to be used to receive the cargo aboard the Fossum. Mr. John Seefeldt, Assistant Dock Superintendent, was present at the dock and assigned men to make preparations for the first step in unloading, namely the securing of buckets to cranes.

Early in the morning of July 7, some 100 or so pickets appeared at the gate entrance to the dock area. A few pickets were also around the dock office, but none of the pickets got nearer than one-half mile to the area where the Fossum was berthed. John Zinos, an agent of the American Federation of State, County and Municipal Employees, AFL-CIO, to which approximately one-half of the dock employees belonged, also came on the dock and talked with Seefeldt. At Zinos' request, Seefeldt called all the dock employees together to meet with Zinos. At this meeting, Zinos, without authority or direction from the union membership, ordered the dock employees not to unload the Fossum. The dock foreman reported to Seefeldt that, after their meeting with Zinos, the dock employees were uncertain about the situation. The dock foreman then called the employees together as a group and informed them as to Zinos' instructions with respect to the Fossum. Seefeldt testified that he had been ordered only to attach the buckets to the crane, but had not received any specific instructions to proceed with the unloading of the Fossum. During the meeting between Seefeldt and the dock employees, the dock foreman pointed out that if the employees proceeded to do anything in connection with the unloading of the Fossum, their homes, families, and persons would be exposed to injury.

18. At about the same time, Mr. Charles Schultz, president of the State CIO, was on the dock, and from there, called the Mayor. During the conversation between Schultz and the Mayor, Schultz agreed to withdraw the pickets from the dock, and the Mayor agreed to order the suspension of the unloading of the Fossum until the legal issues involved could be determined. The Mayor thereupon called Brockel and informed Brockel there had been a labor disturbance at the dock and directed Brockel to order suspension of the unloading operations of the Fossum and to call a meeting of the Harbor Commission for the next day. Brockel, in turn, telephoned his office and issued instructions for the suspension of operations of the unloading of the Fossum. No further attempt was made to require the dock employees to proceed with the discharge of the Fossum, and they were assigned to other duties. The dock employees received a full day's pay for July 7, and, at the request of the Mayor, were not disciplined for any refusal to comply with the orders of their superiors.

19. On the afternoon of July 7, at a time when there were no pickets within the dock area, Seefeldt, without direction from Brockel, requested the captain of the Fossum to move the ship from the dock into the Outer Harbor, with which request the captain complied.

20. On July 7, 1955, Brockel received a letter from plaintiff Paper Makers Importing Co., Inc. confirming the arrangements made with Brockel for the discharge of said plaintiff's cargo from the Fossum and issuing instructions with respect to the disposition of said cargo. On July 8, 1955, Brockel received a similar letter from plaintiff Hammill & Gillespie, Inc.

21. On July 8, pursuant to the Mayor's request, the Harbor Commission conducted an open hearing. At such hearing, Port Director Brockel issued a written report stating that, after considering all of the circumstances, he had agreed to berth and discharge the Fossum; that plaintiffs were not parties to the Kohler strike; that the Kohler strike was not a waterfront strike and, therefore, not entitled to recognition by the Harbor Commission. Brockel urged that the City go through with its responsibility to discharge the Fossum.

Various labor leaders made statements to the effect that they opposed any action

on the part of defendant which would in any way aid Kohler. CIO officials threatened a statewide strike if defendant unloaded the vessel. One representative of the dock employees stated that the dock employees would not unload the Fossum. Another representative stated that, if the employees were requested to unload the Fossum, they would all be sick. It was proposed that defendant order the City's employees to proceed with the unloading of the Fossum, and that if the employees then refused, defendant would be relieved of any obligation. This suggestion was rejected by the Mayor on the ground that the City would then have to discipline its employees which, in turn, might lead to a strike of all the dock employees. The Mayor recommended that the Harbor Commission recommend to plaintiffs that the Fossum be returned to Sheboygan, and that plaintiffs there undertake legal action to eliminate the obstructions to unloading in Sheboygan. A resolution to that effect was proposed by Commissioner Ranney, an official of the Teamsters Union, and passed unanimously by the Harbor Commission. Brian was informed of the decision of the Harbor Commission by telegram on the evening of July 8. Additional letters were delivered or sent by Brockel on July 7, 1955 to the plaintiffs and to the attorney for the owners of the Fossum setting forth in detail the motion passed by the Harbor Commission on the afternoon of July 8, 1955.

22. Some time after 9:00 p. m. C.S.T., on July 8, 1955, and 10:00 a. m. C.S.T., on July 9, 1955, plaintiffs and the representatives of the Fossum renewed their demand that the Fossum be discharged at defendant's dock by serving a written demand on the following officials:

Honorable Frank Zeidler, Mayor
Walter J. Mattison, City Attorney
Stanley J. Witkowski, City Clerk
Milton J. McGuire, President of the Common Council
Board of Harbor Commissioners, City of Milwaukee

H. C. Brockel, Municipal Port Director
Max M. Barczak, Sheriff of Milwaukee County
John Poleyn, Chief of Police, City of Milwaukee
Arthur Skeding, Harbor Commissioner of the City of Milwaukee

Said demand referred to the agreement to discharge the Fossum and asserted defendant would be held liable for any breach of such agreement. Defendant was informed that, unless a reply was received by 12:00 o'clock Saturday noon, July 9, 1955, indicating a willingness to unload the Fossum, it would be presumed that plaintiffs' request was rejected.

23. At approximately 10:00 a. m. on July 9, 1955, Mr. Harry G. Slater, First Assistant City Attorney of the City of Milwaukee, read a statement over the telephone to Mr. Walter Davis of the firm of Robertson, Hoebreckx and Davis, attorneys for the plaintiffs, which was as follows:

"This is Mr. Slater, First Assistant City Attorney, Milwaukee. At the request of Mayor Zeidler, I am reading to you the City's response to your notice of July 8 addressed to several city officials and others.

"You are informed that by resolution at a public meeting held in the City Hall on July 8, in the afternoon, the Milwaukee Harbor Commissioners in effect acted upon the matter of the M/V Fossum. The resolution of the Harbor Commissioners constitutes the city's position. Further, on the basis of the facts available to us the city cannot be deemed to have entered into a contract with the charterers."

24. Commencing at or about 10:30 a. m., July 9, 1955, Brian, his attorney, O. S. Hoebreckx, and others met with Brockel, the Mayor and Slater. The request to discharge the Fossum was renewed verbally. Mayor Zeidler stated that he could not give an official reply, that he would have to consult with the Harbor Commission. Slater advised

Brian and Hoebreckx that his telephonic communication to Walter S. Davis constituted an informal reply to the request served the previous night, and that a formal reply would be mailed under the direction of the City Attorney. A letter signed by Brockel (hereinabove referred to in Finding No. 21) was delivered to Brian, reaffirming the Harbor Commission's decision of the previous day and stating that defendant had been advised by the dock employees and their labor organizations that the dock employees would not handle the Fossum. A verbal request was then made by Brian upon defendant to provide unloading services for the Divina. Brian was instructed by Brockel to make a written request for such service, which written request was served on Brockel, at about 7:00 p. m. on the evening of July 9.

25. In the late afternoon or evening of July 9, Brian, on behalf of plaintiffs, entered into an agreement with the agents of the owners of the vessel Fossum, providing that the vessel be moved from the Port of Milwaukee to Montreal, Canada, and there to be discharged, the cost of discharging to be borne by the charterers, all other diversion costs to be borne by the owner.

During the course of the day on July 11, further inquiries for an available port developed that the Port of Fort William, Canada, had adequate facilities and labor available to discharge the Fossum, with the result that at 4:00 p. m. on July 11, the Fossum was diverted from its course toward Montreal, Canada to Fort William, Canada. It was discovered thereafter that the freight rate from Fort William, Canada to Sheboygan was greatly in excess of the freight rate from Montreal, Canada to Sheboygan, Wisconsin, with the result that at 4:00 p. m., July 12, the Fossum, while enroute to Fort William, Canada, was diverted back to Montreal, Canada, where she was discharged of her cargo. Said clay was transshipped by rail from Montreal to Kohler, Wisconsin.

26. During the course of a meeting on Sunday, July 10, between the Mayor and Charles Schultz, president of the State CIO, Schultz agreed that the CIO would not picket the Divina if the Mayor would appeal to the President of the United States to take steps to settle the Kohler strike. Zinos, Schultz, and the Mayor appeared on radio and television on Sunday evening to announce that defendant would provide dock and unloading facilities for the Divina. The Mayor's statement was also carried in the public press on the morning of July 11, 1955. The Mayor telephoned Brockel and instructed him to proceed to issue confirming letters to plaintiffs honoring plaintiffs' request to discharge the Divina.

27. At about 8:30 a. m. on July 11, Brockel telephoned Brian to advise him that the City would honor his request to dock and unload the Divina, and that a letter confirming said agreement would be transmitted to Brian that morning. Brockel dictated such a letter, but it was never sent, because, before it was delivered, Harvey Kitzman, a regional representative of the UAW-CIO, telephoned the Mayor and informed him that Schultz had no authority to obligate the UAW. The Mayor, in turn, telephoned Emil Mazey, secretary of the International UAW-CIO in Detroit, and pleaded with him to permit the unloading of the Divina. Mazey refused. The Mayor thereupon presented the problem to the Common Council of the City of Milwaukee, which body, in a meeting held on Monday afternoon, July 11, instructed the Harbor Commission to conduct a further hearing and make its recommendations. The radio and press, on the afternoon of July 11, carried stories to the effect that the UAW-CIO had withdrawn from their agreement to permit the unloading of the Divina and to the effect that the Harbor Commission and Common Council would, at a meeting scheduled for July 12, consider the general "clay boat" situation.

28. At 12:30 p. m., July 12, 1955, there was delivered to the said Brockel's office a letter of this same date from O. S. Hoebreckx, Paper Maker's attorney, which letter stated in part:

"This is a request that this office be advised at the earliest possible time as to whether or not any chartered ship, carrying clay, the ultimate destination of which is the Kohler Port, will be handled by the Milwaukee port facilities."

29. At 10:30 a. m. on July 12, 1955, the full membership of the Harbor Commission met pursuant to instructions from the Common Council of the City of Milwaukee to consider general port policy, and particularly the unloading of the Divina. First Assistant City Attorney Harry G. Slater advised the Harbor Commission that:

"Under the statutes, the Harbor Commission has the authority to determine such a policy."

In the course of said meeting, Commissioner Coakley observed:

"We are proceeding on the supposition that labor people of this community will not unload this boat (the Divina). We do not know it, it is not tied up on the docks. Our men have not refused to unload the boat."

A resolution on labor policy was presented to the said Commission on that day, and was passed by a vote of 3 to 2. In the course of the meeting the Mayor informed the meeting that Brockel, pursuant to his instructions, had agreed to provide unloading facilities for the Divina. The Harbor Commission, by a vote of 4 to 1 voted to transmit a letter to the Common Council which stated in part:

" * * * that the Board of Harbor Commissioners can find no legal basis or precedent for refusing the cargo of the M/V Divina. The Board has instructed that letters of confirmation be issued to the owners of this cargo unless the Board is subsequently directed by the Council not to do so."

This letter was signed by Arthur J. Skelding, President of the Board of Harbor Commissioners, and Harry C. Brockel, Secretary.

30. On July 13, 1955, the Committee on Buildings, Grounds and Harbors of the Common Council, acting on the recommendations of the Harbor Commission, recommended adoption of the following resolution by the Common Council:

"Whereas, in accordance with information submitted by the Board of Harbor Commissioners that it can find no legal basis or precedent for refusing the cargo of the M/V Divina, and that said Board has instructed letters of confirmation be issued to the owners of this cargo unless the Board is subsequently directed by the Council not to do so; therefore, be it

"Resolved, by the Common Council of the City of Milwaukee that the aforesaid letters of confirmation be issued to the owners of the cargo of the M/V Divina."

31. The said recommendation was considered by the Common Council at a Common Council meeting held on the said day—July 13, 1955—at which time a substitute motion was offered and passed by the Common Council. The substitute motion read as follows:

"Resolved by the Common Council of the City of Milwaukee that irrespective of the Mayor's and the Board of Harbor Commissioner's invitation to the owner of the M.V. Divina to use our port facilities, that this Common Council go on record notifying the owner that it cannot and will not guarantee the unloading of its cargo, especially 'clay,' for the reason that: (1) the cargo of 'clay' was originally designated for Sheboygan, (2) a labor dispute exists in Kohler involving the Kohler Co. and a local CIO, (3) the Milwaukee County CIO informs this Common Council that it will picket the M.V. Divina if an attempt is made to unload it."

32. On July 14, 1955, at 9:45 p. m., the Divina left its anchorage off Port Colborne, Canada, at which point she had been waiting instructions since July 8, 1955, and proceeded to Montreal, where

she was discharged of her cargo. The clay transported by the Divina was transshipped by rail from Montreal, Canada, to Kohler, Wisconsin.

33. Under date of July 15, 1955, the Mayor of the City of Milwaukee informed the Common Council:

"I am herewith vetoing Resolution File Number 55–1287, which is a resolution concerning the docking of the M.V. Divina at the City of Milwaukee's port facilities.

"After considering this action carefully, I find that for me to sign this resolution would be to go back on my own action of informing the port director that I felt the ship could come into the harbor without incident on the basis of information I then possessed.

"In addition, the resolution does not directly meet the request of the Board of Harbor Commissioners for instructions on whether to follow through on verbal commitments made by the port director on the basis of my information.

"In view of doubt as to what action is expected of the Board of Harbor Commissioners, I recommend that this matter be re-examined by the Common Council."

34. The Milwaukee Common Council, by action taken on July 26, 1955, failed to override the Mayor's veto. No other or further action was taken by the Common Council of the City of Milwaukee, either with respect to the unloading of the Divina or with respect to the policy resolution submitted by the Harbor Commission on July 12, 1955, to the Common Council. No letter of confirmation was ever sent to Brian by the Harbor Commission.

35. At no time during the period from 7:00 a. m., July 7, 1955, through the close of business on July 13, 1955, did any of the dock employes of the defendant quit their employment for the purpose of going out on strike. Brockel informed Brian in their meeting on July 5, 1955, that the City of Milwaukee had excellent police protection. The Harbor Commission has no agreement with, and does not bargain with, any labor organization on behalf of the dock employes employed by the said terminal. Said employes are subject to the Civil Service Regulations of the City of Milwaukee, which regulations provide penalties for insubordination. Some time after July 7, 1955, the said Brockel instructed the superintendent in charge of said terminal to advise the employes involved in the incident affecting the Fossum that their activities with respect thereto constituted a breach of discipline.

36. At no time material to these proceedings has the Harbor Commission, in connection with the operation of said Terminal, ever recognized so-called "inland strikes" involving an employer not engaged in water transportation activities. Said Harbor Commission has had a policy at all times material herein to recognize only "waterfront strikes," and neither the Fossum, the Divina, nor their cargoes were involved in a "water-front strike."

37. On August 4, 1955, charges were duly filed and subsequently amended on August 23, 1955, by Paper Makers Importing Co., Inc., and Hammill & Gillespie, Inc., with the National Labor Relations Board against Local No. 139, International Union of Operating Engineers, AFL-CIO, and certain other labor organizations, alleging that said unions had engaged in unfair labor practices affecting commerce within the meaning of Sections 8(b) (4) (A) and 2(6) and (7) of the Act, 29 U.S.C.A. §§ 158(b) (4) (A), 152(6, 7), in Case No. 13–CC–110. The decision thereto is a matter of official record.

38. On December 30, 1955, in a document reciting the parties' understandings with respect to a joint venture which ensued upon the failure to unload at Sheboygan, and an agreement to bring action against the parties responsible for the damages resulting therefrom, Kohler assigned to plaintiffs all of its rights, title, and interest to any claim Kohler might have against defendant.

39. On January 5, 1956, plaintiffs filed with defendant a claim for damages in the amount of $54,625.95, which claim was disallowed by action of defendant's Common Council on March 20, 1956. The claim seeks recovery for out-of-pocket expenses of plaintiffs for additional travel, telephone, and legal expenses alleged incurred as the result of defendant's failure and refusal to discharge the Fossum and the Divina at its facilities in Milwaukee. The following amounts were paid by plaintiffs or Kohler:

| | |
|---|---:|
| Extra expenses of S. Douglas Brian—July 5–16, 1955 | $ 386.83 |
| Expenses of Malcolm McLaren incident to unloading of Fossum and Divina at Montreal | 84.46 |
| Excess entry fees at Port Huron, Michigan and Detroit, Michigan | 30.00 |
| Telephone calls from New York to Montreal, Milwaukee, Port Huron, Detroit, Easton, and Kohler | 27.85 |
| Telephone calls from Easton, Pa. to Montreal, Milwaukee, New York, Detroit, Easton and Kohler | 279.85 |
| Diversion charges paid owner of Fossum | 1,400.00 |
| Legal expenses incurred by Importers | 11,509.27 |

Additional unloading charges due to discharge at Montreal:

| | | |
|---|---|---:|
| Cost at Montreal | $2.82 per ton | |
| Contract price at Milwaukee | 2.00 per ton | |
| Difference | $ .82 x 3235.6 tons | 2,653.19 |

Additional freight charges from Montreal to Kohler:

| | | |
|---|---|---:|
| Freight rate—Montreal to Kohler, including tax | $13.07 | |
| Freight rate—Milwaukee to Kohler, including tax | 1.247 per ton | |
| Difference | 11.823 x 3235.6 tons | $38,254.50 |
| | Total | $54,625.95 |

◆

40. Plaintiffs reduced their claim by the sum of $76.80 at the trial of the case, said sum representing extra expenses of S. Douglas Brian not attributable to proceedings involving the Fossum and the Divina in Milwaukee in July, 1955.

### Opinion.

Several sharply contested issues are presented for decision in this case. For that reason I think it appropriate to treat them by way of an opinion which will

serve to supplement the Special Findings of Fact and Conclusions of Law.

### The jurisdictional issue.

This question is pertinent only as regards the Fossum. The defendant contends that the title to the clay cargo in the Fossum passed to the Kohler Company when the ship docked at Sheboygan and that the Kohler Company is the real party in interest. Therefore, defendant argues there exists lack of diversity of citizenship since Kohler and defendant are both Wisconsin corporations.

Defendant's contention that title had passed to Kohler cannot be sustained. While it is true that the company had ordered clay from the plaintiffs "F.O.B. Boat at Sheboygan, Wis.", the evidence shows that as far back as 1952 Kohler and the plaintiffs agreed that title to clay cargoes would pass at the time the crane clamshell grabbed the clay in the hold of the vessel at Sheboygan and lifted the clay free of the vessel. This agreement is certainly more specific than the term "F.O.B. Boat at Sheboygan, Wis." and clarifies any doubt about the meaning of the term as it affected title to the clay.

The question of title, however, is not completely decisive of jurisdiction, in my opinion. What defendant really contends is that the court lacks jurisdiction under the terms of § 1359, Title 28 U.S.C., which reads:

"A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

No evidence was adduced which would tend to prove that the assignment by Kohler to plaintiffs of all its rights, title or interest to any claim it might have against the defendant (Finding No. 38) was improperly or collusively made to invoke the jurisdiction of this court. This assignment is not illegal on its face inasmuch as the so-called "assignee clause" [Jud.Code § 24(1), 36 Stat. 1091, 28 U.S.C. § 41(1) (1940)] was repealed by the revision of the Judicial Code in 1948. The assignment was a complete and irrevocable transfer. It cannot be said that the plaintiffs are mere nominal parties, collusively lending the use of their names to create a case cognizable in the federal district court or that they as plaintiffs occupy a spurious status created by sham, pretense or other fiction.

The evidence clearly shows that plaintiffs' interest in the present proceedings is real, absolute and genuine as distinguished from an interest solely by way of accommodation to the Kohler Co. Assuming that title to the Fossum cargo had passed to Kohler at Sheboygan, still the plaintiffs were under the obligation to deliver the clay at a point where Kohler could receive it. Furthermore, plaintiffs as charterers of the ship and consignees of the cargo had an obligation to the owners of the vessel to discharge the cargo. Failure so to do would have made it impossible for the vessel to pick up cargo at Toledo pursuant to the requirements of its return trip charter and thus rendered plaintiffs liable for demurrage charges.

Considering all these circumstances, the Court can come to but one conclusion —that the plaintiffs are the real parties in interest as contemplated by rule 17 (a), Federal Rules Civil Procedure, 28 U.S.C.

### Was there a contract.

It is clear to me that Brockel entered into contracts with the plaintiffs to provide facilities for docking and unloading both the Fossum and the Divina. It is not necessary to dwell on this point since defendant has conceded as much. Defendant's contention is, however, that Brockel lacked authority to contract for or to legally bind the City of Milwaukee. In its brief defendant expresses the nub of its contention as follows:

"Whether or not a contract was entered into depends on the authority, or lack of it, possessed by Harry C. Brockel. It is conceded that if he had authorization to contract on behalf of the city, a valid contract

existed subject to the conditions of the port tariff, and vice versa if he had no such authority."

Defendant further argues that Brockel's status was that of a mere employee with no power to contract; that under Wisconsin statutes and Milwaukee ordinances such power was vested exclusively in the Board of Harbor Commissioners subject to the overriding authority of the Common Council.

Defendant's present argument seems inconsistent since, prior to trial, defendant made the following written admission which is part of the records in this case.

" * * * that the said Brockel was duly authorized by the Harbor Commission to generally supervise and control the operation of the terminal facilities to promote business for the terminal, and to make arrangements personally or through subordinates for the handling of cargoes at said terminal, to establish rates for cargo which the said terminal was equipped to handle, but which were not provided for in the general tariff issued by the Harbor Commission, and to do all other things reasonable and necessary in connection with the operation of said terminal, consistent with the general or special directions of said Harbor Commission, subject, however, to the overriding authority of the Common Council of the City of Milwaukee." (Def.Adm., Pl.Ex. 3, pp. 2 and 3)

Regardless of this fact, defendant has failed to point out any provisions of the Wisconsin statutes or the ordinances of Milwaukee which prohibit the Harbor Commission from delegating the authority to contract to its Port Director, and I have been unable to discover such a prohibition. Rather it appears that the pertinent subsections of the statute vest exclusive power and control of the harbor facilities in the Harbor Commission and allocate to that Board the authority to act or proceed in any manner whatsoever. Section 30.085 of the Wisconsin Statutes authorizes the City of Milwaukee to create a Board of Harbor Commissioners. Subsection 7 of the statutes provides:

"Said board shall have exclusive charge and control over such docks, wharves, warehouses, piers, slips, basins or other structures and harbor facilities and waterways adjacent thereto * * *."

Subsection 8 of the statute provides in part:

"Said board shall have power to fix and to regulate the tolls, dockage, wharfage, craneage, shedage, storage, rates and rental or other charges which it shall deem necessary to make for the use of all publicly owned docks, wharves, warehouses, piers slips, basins, and other harbor and airport facilities, * * * subject, however, to the prior approval of the same by the common council of such city * * *."

Subsection 4 of the statute provides in part that the Board of Harbor Commissioners:

" * * * shall have authority, whenever it shall deem necessary, to act or proceed in any manner whatsoever relating to its powers and duties under this section * * *"

It should be pointed out that prior to the occurrences which are the subject of this suit, the Common Council had approved Municipal Port Tariff No. 9 adopted by the Board of Harbor Commissioners, in effect in 1955 and containing the following provision covering the setting of rates for commodities not included in the tariff:

"Rates will be quoted on application for commodities not listed in this tariff."

The above quoted parts of the Wisconsin Statute and of the port tariff form the basis for my determination that the Board of Harbor Commissioners could legally delegate to its Port Director the authority to manage and operate the harbor including the making of contracts for loading or discharging ships' cargoes.

In addition, I think it appropriate to say that in my opinion the City of Milwaukee in operating harbor and dock facilities is a general wharfinger and, as such, has legal duties and obligations similar to those of a common carrier. Berwind-White Coal Mining Co. v. City of New York, 2 Cir., 1943, 135 F.2d 443. In fact it was stipulated that "Defendant is and at all times material hereto was and has been since 1929 a public wharfinger engaged in the business of owning and operating a public wharf in foreign and interstate commerce."

In operating its municipal port, the City of Milwaukee was engaged in a proprietary function as distinguished from a governmental function. In the exercise of that function it is regarded as having the capacities of a private corporation. Certainly in that capacity the City could legally delegate to a subordinate official through the Harbor Commission the power to contract in regard to the loading and unloading of boats and even in the fixing of rates for handling of commodities which were not included in the published tariff. That being the case, the question pertaining to Brockel's precise authority becomes less critical.

Nevertheless, I must conclude the Harbor Commission could and did delegate to its Port Director authority to bind the City contractually in the instant case.

It hardly seems reasonable that the Harbor Commission should be required to meet and act formally whenever a boat requested the use of the port facilities. No evidence was submitted by defendant, and understandably so, that the harbor facilities were so administered or operated directly by the Commission. On the contrary, the only inference that can be drawn from the evidence is that the Port Director had the delegated authority to arrange with shippers for the use of the harbor facilities.

The foregoing discussion is, I think, sufficiently determinative of this issue; however, one further evidentiary matter cannot be overlooked. The Harbor Commission at its meetings on July 8 and July 12 did not censure Brockel for his commitments to Brian in regard to the Fossum and Divina, or in fact repudiate them. In my opinion the whole import of its actions at these meetings was to ratify Brockel's agreements.

#### Plaintiff's failure to bring the Divina to Milwaukee.

With regard to the Divina, counsel for defendant state in their brief: "The city was at all times ready and willing to proceed to unload the ship, but it could not 'guarantee' that circumstances beyond its control would not intervene, thereby preventing the city from unloading the ship. Inasmuch as the plaintiffs never sent the Divina to Milwaukee, the defendant was unable to perform its part of the agreement, and if a breach of contract took place, it was a breach on the part of the plaintiffs in not bringing the ship to the Port of Milwaukee."

The facts are that the Divina was on the Great Lakes at the time the Fossum was sent from Sheboygan to Milwaukee. Following the initial difficulty involving the Fossum at Milwaukee, the Divina was held at Port Colborne to await instructions. The Mayor appeared on television on Sunday, July 10 and announced that the Divina would be unloaded pursuant to an agreement between the city and certain labor leaders. It developed that on the next day these labor leaders withdrew their support and such agreement was rescinded.

On July 12, Brockel received a letter from Hoebreckx requesting confirmation from those in authority on whether the city would honor its contract to unload the Divina. Later that same day, the Harbor Commission met and voted to send a letter to the Common Council that there was no legal basis for refusing to discharge the Divinia. The Common Council met the following day. Instead of adopting a resolution passed by its Buildings-Grounds-Harbors Committee that the Harbor Commission's position be ratified, the Council passed a substitute resolution to the effect it could not

and would not guarantee the discharge of the Divina because the cargo was originally destined for Sheboygan, because of the Kohler dispute, and because of a threat of the CIO to picket the Divina if an attempt to unload were made. No reply was ever made to Hoebreckx' letter of July 12. On July 14 the Divina left Port Colborne for Montreal.

In view of what had happened to the Fossum, plaintiffs were fully justified in not bringing the Divina to Milwaukee. The effect of the Common Council's resolution on the 13th was a repudiation of Brockel's agreement to unload the vessel. Plaintiffs were entitled to treat this resolution as an anticipatory or prospective breach of contract. It was a reasonable assumption on plaintiffs' part that had the Divina been sent to Milwaukee, the situation which developed with regard to the Fossum would have been repeated. Under all the circumstances, tendering the Divina at Milwaukee would have been a useless act resulting in unnecessary expense.

### Was defendant excused from performance.

■ Finally, the defendant contends that if a contract existed, it was prevented from performing by unavoidable causes and circumstances beyond its control. As defendant admits in its brief: "Probably the most important defense the city has is the defense of excusable nonperformance."

Tariff No. 9 entitled, "Board of Harbor Commissioners, City of Milwaukee, Public Port Tariff and Rules and Regulations Governing the Application of Rates and Charges as Set Forth in the Tariff," reads as follows:

"Item 50. Responsibility.

"The Board shall not be responsible for loss or damage to freight in its possession caused by fire, frost, heat, leakage, failure of building, animals, insects, dampness or the elements, nor will it be responsible for any delay, loss or damage arising from riots, strikes, war, insurrec-

tion, or any cause unavoidable or beyond its control."

I think the above language can be interpreted so as to excuse the city from performing a contract to unload a vessel in its harbor if prevented by a strike or "any cause unavoidable or beyond its control." Since there was no strike of the dock workers, the question arises: Were there causes unavoidable or beyond the city's control which prevented performance?

Although it is true that a number of pickets gathered at the dock entrance on the morning of July 7 and that Zinos, the business agent for the American Federation of State, County and Municipal Employees, AFL–CIO, "advised" or ordered the dock workers not to unload the Fossum, it must be noted that no strike was called by the dock workers nor did they in fact refuse to do any work which was ordered. What did exist, aside from the appearance of some pickets for a few hours and Zinos' "advice", was a threat by certain labor leaders that a general or state-wide strike would be called if an attempt was made to unload the ship, together with the unspoken implication or inference that such a strike might result in public disturbances.

Threats of strikes were not, in my opinion, sufficient to excuse the defendant from using its best efforts to perform its contract. The city had the duty, in spite of these threats and pressures, to make an actual attempt to unload the Fossum. If initial attempts had been frustrated by disturbances designed to prevent the unloading, the city would have the further duty to exert additional efforts in its endeavor to perform the contract. A situation might have come into existence had the threats of the labor leaders materialized which would have required the city to apply to the courts for such remedies as were appropriate, including coping with illegal picketing or any violence that might have developed. Moreover, the city had its police force to maintain law and order,

which force could have been augmented, if necessary, by outside help.

At no time after the pickets appeared near the harbor and Zinos visited the docks did the city take any initial step which might have been effective in unloading the Fossum. After that time no order was issued that the dock workers proceed with unloading the vessel. Instead, the city officials surrendered to the pressures and threats of the labor leaders.

Whether such leaders spoke for the membership of their unions is unknown; and it is needless to speculate whether the labor groups or their leaders felt justifiably provoked into making these threats. Further, it cannot be known whether the threats of a general strike would have been carried out and what consequences would have followed if they were carried out. What is an established and important fact is that the responsible city officials made no real or valid attempt to unload the Fossum. Instead, all their efforts were directed toward placating those who were determined that the Fossum and the Divina should not be unloaded and in attempting to persuade plaintiffs that the Fossum should return to Sheboygan.

I do not want to minimize the difficult and embarrassing position of the city officials or discount their responsibility to avoid the grave situation that was threatened if such avoidance was possible and consistent with an equal responsibility to see that the municipal port facilities were made effectively available to all legitimate shippers. Furthermore, I am not unaware that facts indicate that the threats made by the labor leaders were anything but of a serious nature. I do not, however, think that the city at any time did what it was legally obliged to do—to undertake all reasonable efforts to unload the vessels. I am unable, therefore, to conclude that the city was excused from performance of its contractual obligations by causes unavoidable or beyond its control since no active effort was made to avoid or to control the causes which prompted the city officials to repudiate the contracts.

In making this determination, no implications are intended with regard to the situation or factors which created or involve the strike at Kohler. The question is simply whether threats of strikes which might have carried in their wake public disturbances and violence, no matter from where or from what the threats stemmed, provided a legal excuse for the city to abandon all reasonable efforts to carry out its contractual obligations.

### Damages.

The question of damages is treated in the Findings of Fact Nos. 39 and 40 and in the Conclusions of Law Nos. 12 to 18. However, I feel it necessary to express my views more thoroughly on two items, the $1,400 charge incurred by reason of the temporary diversion of the Fossum from its course toward Montreal to Fort William and plaintiffs' claim for legal expenses incurred during the period involved in this suit.

I feel the diversion charge is a proper element of damage since it represents a legitimate expense incurred by the plaintiffs in a reasonable and good faith effort to mitigate damages. The facts disclose that after the Fossum was dispatched to Montreal, plaintiffs discovered that Fort William, Canada also possessed facilities capable of docking and discharging the vessel. Fort William is considerably closer to Kohler, Wisconsin, the ultimate destination of the clay cargo, than is Montreal. The ordinary reasonable business man would be justified in expecting that the rail freight rate from Fort William would be substantially less than from Montreal. As disclosed by the evidence, the rate from Fort William was actually nearly double. Plaintiffs were faced with an immediate decision. At the time the vessel was diverted, plaintiffs were in the process of checking these freight rates but were unable to obtain immediate information. The information was obtained within a period of 24 hours and, as a consequence the Fossum was redi-

verted. Viewing plaintiffs' position with a standard of foresight rather than hindsight, I feel their decision to divert the Fossum was prudent.

On the question of plaintiffs' legal expenses, I am of the opinion that such expenses are not a recoverable item of damages. A large part of these legal expenses concern activities undertaken before the N. L. R. B., the result of which was the opening of the Port of Sheboygan to subsequent vessels carrying cargo destined for the Kohler Co. A part of these expenses were charged for time spent in legal research in anticipation of the present suit. The remaining portion of the attorneys' charges cover legal advice and assistance rendered to plaintiffs during the period from July 8 until the Fossum and Divina were ultimately unloaded in Montreal. The assistance given involved among other things accompanying Brian to meetings with the Mayor, the Harbor Commission and the Common Council; conferring with Kohler officials and handling press and radio releases. The charges are not broken down or allocated to specific activities but rather consist of a lump sum for all services rendered.

I am unable to conceive how legal expenses for processing a charge before the N. L. R. B. can be such consequential losses resulting from breaches of the contracts herein as were natural and probable under the circumstances contemplated by the parties at the time the contracts were made. Defendant's contracts with plaintiffs involved only the Fossum and the Divina; its liability for damages includes only the expenses incurred by plaintiffs in securing the discharge of these vessels elsewhere. Defendant had no contract with plaintiffs to service the other four vessels expected by plaintiffs during the 1955 shipping season. The purpose of the N. L. R. B. action was to insure that these other four vessels would be unloaded at their point of destination, Sheboygan, and, as such, had no consequential connection with defendant's breaches of the instant contracts.

But regardless of their consequential connection to defendant's breaches, I feel all claimed legal expenses should be disallowed. The law does not generally recognize attorneys' fees as recoverable damages unless authorized by statute or contract. There are, of course, exceptions to this rule such as where the natural and proximate result of a wrongful act by a defendant has involved a plaintiff in litigation with third parties.

However, as previously stated, I do not feel that the N. L. R. B. proceedings were the natural and proximate result of defendant's breaches of contracts or, in fact, had any connection to the contracts here in question. And certainly the cost of legal advice and assistance rendered plaintiffs during the period from July 8 until the vessels were discharged in Montreal cannot be conceived of as expenses incurred as the result of litigation with third parties. I do not think a party's cost of securing legal advice in order to better understand his rights or obligations should be considered a recoverable item of damage.

Conclusions of Law.

1. This court has jurisdiction over the parties and the subject matter of this proceeding.

2. The Board of Harbor Commissioners, under Wisconsin statutes, has exclusive charge and control over the operation of defendant's port facilities and has the power to fix rates for the services the Board is equipped to supply.

3. Harry C. Brockel was duly appointed Port Director by the Harbor Commission, and in that capacity, was duly authorized to make arrangements for the handling of vessels and cargo at defendant's port and to fix rates for services performed not specifically covered in the port tariff issued by the Harbor Commission.

4. Defendant's port operations constituted a proprietary function.

5. Defendant, in connection with its port operations had the legal duties and obligations of a common carrier.

6. On July 5, 1955, defendant contracted with plaintiffs for the docking and unloading of the Fossum at its facilities in Milwaukee, Wisconsin.

7. On July 8, defendant's Harbor Commission, acting for defendant, repudiated its contract to dock and discharge the Fossum. This repudiation was reaffirmed on behalf of defendant by the City Attorney on the morning of July 9, and in a letter from H. C. Brockel to plaintiffs, also dated July 9.

8. On July 11, 1955, defendant contracted with plaintiffs to dock and discharge the Divina at defendant's facilities in Milwaukee, Wisconsin. On July 13, 1955, defendant, acting through its Common Council, repudiated said agreement when the Common Council refused to confirm the recommendation of the Harbor Commission that letters confirming defendant's agreement to discharge the Fossum be forwarded to plaintiffs.

9. Under these circumstances, plaintiffs had no legal obligation to hold the Fossum in Milwaukee beyond July 9, 1955, or to offer the Divina for unloading at the Port of Milwaukee after the action of the Common Council on July 13. Plaintiffs were entitled to treat these repudiations as a total breach of defendant's agreement to provide service and facilities for these two vessels and to sue for the damages resulting from such breach.

10. Defendant was not excused from performance under the exculpatory clause in the public port tariff.

11. Defendant did not fulfill its obligation as a common carrier to take every reasonable and possible means to provide the facilities and service demanded by plaintiffs.

12. Defendant, because of the repudiation of its agreement to dock and discharge these vessels, is liable for the additional expense incurred as a direct and proximate result of such repudiation.

13. The travel, entry fee, and telephone expense, except for the expenses amounting to the sum of $76.80 incurred by S. Douglas Brian in Milwaukee on July 7 and 8, were expenses incurred as the direct and proximate result of defendant's failure to provide service for these vessels.

14. The $1,400 diversion payment made by plaintiffs to the owners of the Fossum was the direct and proximate result of defendant's repudiation of its obligation to discharge the cargo of the Fossum at its Milwaukee facilities.

15. Plaintiff is not entitled to recover its claimed legal fees and expenses.

16. The difference between the cost of discharging these vessels in Montreal and the discharging costs in Milwaukee and the difference in transshipment from Montreal and transshipment from Milwaukee are expenses incurred as the direct and proximate result of defendant's repudiation of its agreements to discharge the Fossum and Divina and of defendant's failure to comply with plaintiffs' request for dock and unloading facilities at the Port of Milwaukee.

17. Plaintiffs, having contracted for the discharge of the vessels at Montreal and for the transportation by rail of the clay from Montreal to Kohler, Wisconsin, were primarily liable for the payment of such charges and are entitled to collect for the same, notwithstanding the fact that Kohler ultimately paid these charges. Following the failure to unload the Fossum at Sheboygan, Kohler and plaintiffs were engaged in a joint enterprise for the purpose of discharging these cargoes at the nearest available port and transshipping their cargoes to Kohler, Wisconsin. Kohler's assignment to plaintiffs of December 30, 1955, authorized plaintiffs to sue and collect for all damages incident to defendant's repudiation of its contracts with plaintiffs and its failure to meet its common carrier obligations.

18. Defendant, City of Milwaukee, is liable to plaintiffs, Paper Makers Importing Co., Inc. and Hammill & Gillespie, Inc., in the amount of $43,039.88.

19. Plaintiffs are entitled to judgment in the amount of $43,039.88. The Clerk of the Court is hereby directed to enter judgment for the plaintiffs and against the defendant accordingly.